IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 3:24-CR-152-SA

YOHANNES TEKIE GEBREZGHI                                                    DEFENDANT

ORDER

On October 16, 2025, the Defendant, Yohannes Tekie Gebrezghi, filed a Motion to Suppress Evidence [33]. The Government filed a Response [39] in opposition. The Court held a hearing on the Motion [33] on November 4, 2025, and is now prepared to rule.

*Relevant Factual Background*

On December 4, 2024, Gebrezghi was charged in a three-count Indictment [1]. The three charges against him are (1) felon in possession of a firearm, (2) interstate travel to acquire firearms, and (3) firearms trafficking. These charges stem from a traffic stop that occurred during daylight hours (around lunchtime) on September 26, 2023.

On the date of the stop, two highway patrolmen, Adam Zachary and Wade Jones, were patrolling on Interstate 22 in Union County, Mississippi headed westbound.[1] The troopers were traveling in a single marked vehicle being driven by Trooper Zachary. Gebrezghi, who was traveling in the same direction as the troopers on Interstate 22, was driving a white Toyota 4Runner—a rental vehicle bearing a California tag.

While Gebrezghi was traveling in the right lane, the troopers approached his vehicle in the left lane. The troopers testified that they observed the make and model of Gebrezghi's vehicle and

---

[1] Both Trooper Zachary and Trooper Jones were working as part of the interdiction unit on the date of the stop. According to Trooper Jones' testimony at the hearing, the interdiction unit works major highways and interstates looking for high risk criminals and the transportation of drugs or money, along with other illegal activity.

noticed the California tag as they approached it. As the troopers passed Gebrezghi, they observed his demeanor as the driver of the vehicle and described him as being "locked" on the steering wheel.[2] Once the troopers had passed Gebrezghi, they each continued to observe Gebrezghi's vehicle through the right, sideview mirror of the patrol car. Both troopers testified that they independently saw the front right tire of Gebrezghi's vehicle make contact with the fog line[3] as they observed the vehicle through the sideview mirror.

For his part, Trooper Zachary testified that he saw Gebrezghi's vehicle cross the fog line and go over the rumble strip. Trooper Jones testified that he saw Gebrezghi's vehicle drift to the right and touch the fog line. Gebrezghi denies having touched or crossed the fog line and testified that he was using lane assist while driving the Toyota 4Runner. The patrol car driven by Trooper Zachary did not have a rear-facing camera and therefore there is no video footage of this alleged traffic violation.

After observing the alleged violation, Trooper Zachary slowed the patrol vehicle down, which was still traveling in the left lane, so as to allow Gebrezghi to pass the patrol car from the right side. When Gebrezghi's vehicle did not pass, Trooper Zachary pulled into the right lane and then onto the right shoulder of the interstate. Once Gebrezghi's vehicle, which was still traveling in the right lane, passed the patrol car, Trooper Zachary then pulled into the right lane behind Gebrezghi. Both troopers then observed Gebrezghi's vehicle "bump" the fog line a second time, and Trooper Zachary activated the patrol vehicle's blue lights to initiate the stop. The patrol car's dash cam captured the second incident, as well as the troopers' subsequent search of Gebrezghi's vehicle. This video footage was admitted into evidence at the hearing.

---

[2] Gebrezghi's girlfriend was a passenger in the vehicle.
[3] The "fog line" is the solid white line located on the right side of the right lane.

The footage of the stop shows that Trooper Jones exited the patrol car and approached Gebrezghi's vehicle on the passenger's side. Trooper Jones testified that he immediately smelled the odor of marijuana coming from inside the vehicle. Trooper Jones then asked Gebrezghi to step out of the vehicle so that he could inform him of the reason for the stop, and Gebrezghi complied. In his Motion [33], Gebrezghi concedes that, during the stop, he admitted to the troopers that "there was a small amount of marijuana in the vehicle, which he voluntarily surrendered." [33] at p. 1.

The video footage corroborates Gebrezghi's admission of his marijuana possession to the troopers. He also specified that the marijuana was located in the driver's side door. Gebrezghi denied having any weapons or anything illegal in the vehicle other than the marijuana. Trooper Jones then informed Gebrezghi that, since he had admitted to having marijuana in the vehicle, the troopers would be conducting a search of the vehicle.

During the search, Trooper Jones noticed that the two front door windows would not roll all the way down. Trooper Zachary moved the front passenger door back and forth and noticed a rattling sound coming from the door. Trooper Jones also noticed the rattling sound, began searching the interior panel of the front passenger door, and discovered several handguns. The troopers then searched the interior panel of the two rear doors and found gun magazines, two handheld radios, a long gun located in the rear hatch door panel, and more handguns in the interior panel of the front, driver's side door.

All of the charges against Gebrezghi relate to the discovery of the firearms. In his Motion [33], Gebrezghi raises two arguments in favor of suppression: (1) that the troopers lacked reasonable suspicion to stop the vehicle and (2) that the troopers' search was unconstitutional and exceeded the scope permitted by law. He contends that all evidence seized during the stop should therefore be suppressed.

*Burden of Proof and Judge's Role*

"In general, 'on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights.'" *United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 612 (S.D. Tex. 2019) (quoting *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993)). However, "[t]his burden . . . shifts to the Government if the search or seizure in question was performed without a warrant." *Id*. (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)); *see also U.S. v. Martinez*, 486 F.3d 855, 859-60 (quoting *Roch*, 5 F.3d at 897) ("Where the facts are undisputed that the arrest and seizures were made without benefit of warrants of any kind, the government bears the burden of proving it had reasonable suspicion to seize the defendant."). The Government "must satisfy that burden by a preponderance of the evidence." *Portillo-Saravia*, 379 F. Supp. 3d at 612 (citing *U.S. v. Matlock*, 405 U.S. 164, 177 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)) ("The controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Further, it is the role of the district judge to act as the fact-finder at a suppression hearing. *See, e.g., United States v. Weaver*, 2024 WL 69911, at *7 (N.D. Miss. Jan. 5, 2024); *see also United States v. Tovar*, 719 F.3d 376, 384 (5th Cir. 2013). As such, "it is well within the trial court's discretion to weigh the evidence and make credibility determinations[.]" *Weaver*, 2024 WL 69911 at *7 (quoting *United States v. Jones*, 187 F. Supp. 3d 714, 723 (M.D. La. 2016)) (internal quotation marks omitted).

*Analysis and Discussion*

It is undisputed that the troopers acted without a warrant in this case; therefore, the Government bears the burden to show by a preponderance of the evidence that the stop and

subsequent search were valid. The Court will address Gebrezghi's arguments in favor of suppression in turn.

I.   *Validity of the Stop*

The issue of whether the stop was valid is critical in this case. "If the entire stop was unconstitutional—as [Gebrezghi] contends—[then] all evidence from the stop must be suppressed." *United States v. Derryberry*, 2023 WL 1930748, at *5 (N.D. Miss. Feb. 10, 2023) (citing *United States v. Labrador-Peraza*, 563 F. Supp. 3d 563, 570 (W.D. La. 2021) (explaining that a motion to suppress "invokes" the exclusionary rule)); *see also United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir. 2019).

"The exclusionary rule was created by the Supreme Court to 'supplement the bare text' of the Fourth Amendment, which 'protects the right to be free from unreasonable searches and seizures,' but … is silent about how this right is to be enforced." *Ganzer*, 922 F.3d at 584 (quoting *Davis v. United States*, 564 U.S. 229, 231, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011)). "It operates by generally 'barring the prosecution from introducing evidence obtained by way of a Fourth Amendment violation.'" *Id*. A traffic stop is considered a seizure within the meaning of the Fourth Amendment and is therefore "subject to the constitutional imperative that it not be unreasonable under the circumstances." *Portillo-Saravia*, 379 F. Supp. 3d at 612 (internal quotation marks and citations omitted).[4]

As noted, Gebrezghi first argues that the troopers violated his Fourth Amendment rights because they lacked reasonable suspicion to stop his vehicle. He seeks exclusion of all evidence obtained as a result of the stop on that basis. In response, the Government provides one reason for

---

[4] Notably, "[t]his 'reasonableness' inquiry is objective; it does not depend 'on the actual motivations of the individual officers involved.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)).

5

the stop—Gebrezghi's vehicle "bumped or touched" the fog line on two occasions amounting to careless driving in violation of Mississippi traffic laws.[5]

The legality of a traffic stop is governed by the two-pronged analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). This standard is a two-pronged reasonable suspicion inquiry: (1) whether the officer's action was justified at its inception; and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop. *Id*. Gebrezghi only contests whether the stop was justified at its inception. Accordingly, the Court will only address the first prong of the *Terry*-stop inquiry.

To justify a traffic stop, "an officer need only have reasonable suspicion that 'some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.'" *United States v. Rosales-Giron*, 592 F. App'x 246, 250 (5th Cir. 2014) (quoting *United States v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). "In making reasonable suspicion determinations, we look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Espinosa-Alvarado*, 302 F.3d 304, 306 (5th Cir. 2002) (internal quotation marks and citations omitted).

"Reasonable suspicion is a low threshold; it is not probable cause." *United States v. Walker*, 49 F.4th 903, 907 (5th Cir. 2022) (citing *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015)); *see also United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020). "Certainly, then, if

---

[5] At the suppression hearing, Trooper Jones testified that, to him, the terms "bump" and "touch" mean the same thing.

6

officers 'have probable cause to believe that a traffic violation has occurred,' then there is also reasonable suspicion to stop the vehicle." *Id.* (quoting *Whren*, 517 U.S. at 810, 116 S. Ct. 1769).

The Court first turns to whether bumping or touching the fog line constitutes careless driving as contemplated by Mississippi statutory law. On this point, Gebrezghi argues that "[s]uch a de minimis and momentary deviation, if it occurred at all, does not establish reasonable suspicion of a traffic violation." [33] at p. 2. In other words, he argues that bumping or touching the fog line does not violate Mississippi traffic laws. The Court disagrees.

In Mississippi, "[a]ny person who drives any vehicle in a careless or imprudent manner, without due regard for the width, grade, curves, corner, traffic and use of the streets and highways and all other attendant circumstances is guilty of careless driving." MISS. CODE ANN. § 63–3–1213.[6] The Fifth Circuit, as well as the Mississippi Supreme Court, has concluded that crossing or "bumping" the fog line violates Mississippi's careless driving statute and is sufficient to justify a stop by law enforcement.

For instance, in *United States v. Rosales-Giron*, 592 F. App'x 246, 251-52 (5th Cir. 2014), the Fifth Circuit noted that Mississippi's careless driving statute is quite broad and consequently hitting or bumping the fog line justifies a traffic stop, even if it only occurs once.

Relying in part on *Rosales-Giron*, the Mississippi Supreme Court reached the same conclusion in *Martin v. State*, 240 So. 3d 1047 (Miss. 2017). There, the court affirmed the trial court's finding that a deputy's observations of the defendant crossing and later "bumping" the fog line was sufficient to justify the stop based on a violation of Mississippi's careless driving statute. *Id.* at 1054.

---

[6] Careless driving is considered "a lesser offense than reckless driving." *Id.*

As *Rosales-Giron* and *Martin* make clear, a vehicle bumping or crossing the fog line constitutes careless driving in violation of Mississippi traffic laws. Having addressed that portion of Gebrezghi's argument, the Court reverts to the issue of reasonable suspicion. There are two instances in which the troopers testified that they observed Gebrezghi either bump or cross the fog line. The Court will address each incident in turn beginning with the incident captured by the dash cam footage.

The video footage begins after the troopers passed Gebrezghi's vehicle as the patrol car travelled in the left lane. It shows the moment Gebrezghi's vehicle shifts to the right towards the fog line and what the troopers describe as the second time Gebrezghi "bumped" the fog line. A dark shadow appears on the right side of Gebrezghi's vehicle making it extremely difficult to discern whether the right-side tires of the vehicle actually touched the fog line or only came very close to touching it. Stated simply, based solely on the dash cam footage, it is inconclusive whether Gebrezghi's vehicle made contact with the fog line.[7] However, the Court also considers the troopers' testimony at the hearing.

At the suppression hearing, Trooper Jones testified that he was not aware of who Gebrezghi was prior to the stop in question. During his direct examination, Trooper Jones testified that he observed Gebrezghi's vehicle make contact with the fog line a second time after Gebrezghi's vehicle had passed the patrol car. He identified the instance captured on the dash cam as the second time he observed Gebrezghi's vehicle commit the infraction. Trooper Zachary gave the same account of the second time he observed Gebrezghi commit the infraction. Like Trooper Jones, Trooper Zachary testified that he had never heard of Gebrezghi prior to the date of the stop. Trooper Zachary described the second infraction as Gebrezghi having "bumped" the fog line.

---

[7] In light of its determination that the video footage is inconclusive, the Court rejects Gebrezghi's argument that the footage demonstrates that his vehicle did not touch the fog line.

Although the video footage does not conclusively establish whether Gebrezghi made contact with the fog line on the second instance, it does *not* contradict the troopers' testimony. Again, whether Gebrezghi's vehicle actually touched the fog line is inconclusive but, in the Court's view, the footage does not necessarily discredit the troopers' observations. In light of the inconclusive nature of the available video footage, the Court also does not find it unreasonable for them to have made such an observation. The Court found the troopers' testimony to be credible.

In the *Martin* case referenced previously, the Mississippi Supreme Court affirmed a trial court's denial of the defendant's motion to suppress based on very similar facts. *See Martin*, 240 So. 3d at 1047. In *Martin*, a sheriff's deputy observed the defendant cross over the right lane fog line. *Id.* at 1049. The deputy then pulled beside the defendant's vehicle before slowing down and subsequently getting behind it. *Id.* Then, the deputy observed the defendant "hit the line or get real close to it again[,]" and this second occurrence was recorded on the patrol vehicle's dash cam. *Id.* No other traffic violation on the part of the defendant was at issue. *Id.*

The defendant filed a motion to suppress arguing that the sheriff's deputy had no probable cause or reasonable suspicion for the traffic stop and that the video evidence contradicted the deputy's testimony. *Id.* at 1053. In analyzing the footage, the court described the second incident as the defendant's vehicle "com[ing] close to the fog line, if not contacting it." *Id*. With regard to the second incident, the deputy testified that "he believed it had touched the fog line." *Id.* Finding no clear error, the court noted that the trial judge found the deputy's testimony to be credible and ultimately "discern[ed] no instance in which the video contradict[ed] [the deputy's] testimony." *Id.*

Further, in *Dominick*, the Mississippi Court of Appeals affirmed the trial court's finding of probable cause to stop a vehicle where the defendant had "'bumped' or 'simply rode' the fog line

9

prior to changing lanes." *Dominick v. State*, 108 So. 3d 452, 456 (Miss. Ct. App. 2012). In that case, it was not clear from the dash cam video whether the defendant's vehicle had touched the fog line or not, but the video also did not contradict the officer's testimony that he had observed the infraction. *Id.* In reaching its decision, the court also noted that the defendant did not dispute the officer's testimony. *Id.*

Like the evidence presented in *Dominick* and *Martin*, the troopers' testimony in this case that they observed Gebrezghi's vehicle make contact with the fog line on the second occasion is uncontradicted by the video footage. Having found the troopers' testimony credible, the Court rejects Gebrezghi's arguments to the contrary. Again, the Court has already rejected Gebrezghi's argument that the footage does not depict him committing any infraction. Thus, based on the troopers' testimony of their personal observations, which, again, the Court found credible, the Court finds that they had probable cause to stop Gebrezghi's vehicle. *See Rosales-Giron*, 592 F. App'x at 251 ("[P]robable cause to make a traffic stop exists, *inter alia*, when a defendant commits a traffic violation and a law-enforcement officer observes the violation.") (citing *United States v. Khanalizadeh*, 493 F.3d 479, 482 (5th Cir. 2007)). And because probable cause is a higher standard than reasonable suspicion, the Court finds that the stop was justified and valid. *See Walker*, 49 F.4th at 907.

Importantly, even if the Court were to accept Gebrezghi's argument as to the second infraction and disregard it altogether, the ultimate conclusion would remain unchanged. At the hearing, Trooper Zachary testified that he observed, through the right, sideview mirror, Gebrezghi's vehicle run off the road and over the rumble strip (located on the outside of the fog line). According to Trooper Zachary, this incident occurred prior to the infraction captured by the dash cam, which was *before* the patrol car pulled onto the right shoulder. He testified that

Gebrezghi's vehicle went into the rumble strip so far that if the patrol car had been close enough, then the noise of the rumble strip would have probably been captured on the dash cam video's audio. He also described the first infraction as being more aggressive than the second time he observed Gebrezghi "bump" the fog line. The Court found Trooper Zachary's testimony regarding the first time he observed Gebrezghi commit the infraction credible.

The Court notes that Trooper Jones likewise testified that he independently saw Gebrezghi commit the first infraction through the right, sideview mirror. Candidly, the Court sees no need to address his testimony as it ultimately does not contradict that of Trooper Zachary's. The only contrary evidence that Gebrezghi presented on that point was his own testimony. Stated simply, the Court did not find it credible.

Again, the threshold for reasonable suspicion is low, which, pursuant to Fifth Circuit precedent, "requires only 'some minimal level of objective justification.'" *Smith*, 952 F.3d at 648 (quoting *Castillo*, 804 F.3d at 367). The troopers had reasonable suspicion sufficient to justify making the traffic stop based on their observation of the first infraction alone. Gebrezghi's request that evidence be suppressed based on the legality of the stop is denied.

   II.   *Scope of the Search*

Next, the Court considers whether the troopers' search of Gebrezghi's vehicle was within the scope permitted by law. The Court first notes that, although the Motion [33] alleges that Gebrezghi consented to the search of his vehicle, there was no testimony elicited from him in that regard at the hearing. The Government argues that the search of the vehicle was not conducted based on consent but, rather, was based on independent probable cause. As the Court noted above, the video footage does not support Gebrezghi's account that he consented to the search. Therefore, consent and the corresponding scope thereof is a nonissue. However, in his Motion [33], Gebrezghi

11

does briefly argue that "[b]ecause no such probable cause existed, the continued search was unconstitutional." [33] at p. 3. The Court will address this argument out of an abundance of caution.

There is an exception to the Fourth Amendment's warrant requirement that applies to automobiles. *United States v. Riojas*, 139 F.4th 465, 474 (5th Cir. 2025). "That exception permits a warrantless search of a readily mobile vehicle … when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime." *Id.* (quoting *United States v. Clayton*, 98 F.4th 256, 263 (5th Cir. 2024)) (internal quotation marks and additional citations omitted). "A law enforcement officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* (citations omitted). Like the reasonable suspicion standard, "[t]he totality of the circumstances determines probable cause." *Id.*

The Fifth Circuit "has consistently held that the smell of marijuana alone may constitute probable cause to search a vehicle." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999) (collecting cases). Trooper Jones testified that he smelled the odor of marijuana when he first approached the vehicle on the passenger's side. Additionally, it is undisputed that Gebrezghi admitted to the troopers that he had a small amount of marijuana located in the driver's side door. Given that Gebrezghi's admission corroborates Trooper Jones' testimony, the Court finds that the troopers had probable cause to search Gebrezghi's vehicle for additional contraband. *See United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) ("It is well settled that warrantless searches of automobiles are permitted by the Fourth Amendment if the officers have probable cause to believe that the vehicle contains contraband or other evidence of a crime.").

Regarding the scope of the search, Gebrezghi appears to take issue with what he describes as the "dismantling" of the vehicle. He contests the legality of the troopers' search of the interior paneling of the vehicle doors.

"The scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause." *United States v. Ross*, 456 U.S. 798, 823, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982). Thus, "the scope of a warrantless search of an automobile … is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Salemi-Nicoloso*, 353 F. Supp. 3d 527, 539 (N.D. Miss. 2018) (quoting *Ross*, 456 U.S. at 824, 102 S. Ct. 2157) (internal quotation marks omitted). In other words, "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* (quoting *Ross*, 456 U.S. at 825, 102 S. Ct. 2157) (internal quotation marks omitted).

At the hearing, Trooper Jones testified that he and Trooper Zachary searched the vehicle for approximately 20 to 30 minutes before finding the firearms. The entire search is captured on the dash cam footage. The video footage shows Trooper Jones first searching the rear passenger area of the vehicle. Trooper Zachary begins to search the trunk of the vehicle. After searching those areas, Trooper Jones is then seen attempting to roll down the window of the driver's side door. The window did not roll all of the way down. He later attempts to roll down the front passenger window and encounters the same issue. At the hearing, Trooper Jones testified regarding his observations surrounding the driver and passenger door windows. He stated that, based on his

13

training and experience, if persons place enough things inside the door paneling then it causes the windows to not roll all the way down because the objects will stop the window from rolling down.

After noticing the issue with the front passenger door window, the video footage shows Trooper Jones attempting to look inside the interior paneling of the door with a flashlight. Trooper Zachary then approaches the front passenger door. He is then seen moving that door back and forth. At the hearing, Trooper Zachary testified that he heard something sliding inside the right passenger door, which he also referred to as a rattling sound. He testified that he did not know in that moment what the object was.

Trooper Jones further testified that vehicle panels are referred to as natural voids or hidden compartments. He also testified that, based on his training and past experience, vehicle door panels are a place where law enforcement can expect to find illegal drugs and that he had in fact previously located drugs in that same area in other vehicles. Trooper Zachary likewise testified that the door panels are a place where contraband can be located based on his experience. He referred to those areas as natural voids.

Aside from noticing that the driver and front passenger windows would not roll all the way down and hearing a sliding sound coming from the front right door, the troopers noticed a ratchet set in the rear floorboard of the vehicle during the search. Trooper Jones testified that the ratchet set caught his attention because, in his experience, persons use small tools to assist with hiding things in compartments or natural voids.

The video footage then shows Trooper Jones searching the interior door paneling of the right passenger door by slightly lifting the bottom right corner of the paneling. He finds several handguns hidden inside the paneling of that door and removes them from the paneling. The troopers then begin searching the other doors' interior panels, including the rear hatch door. As

they searched the other doors, the troopers then received information from dispatch indicating that Gebrezghi had a prior conviction for arms trafficking.

Overall, the troopers' account of what took place during the search, including their observations and the information they received from dispatch, is corroborated by the video footage, and the Court found their testimony credible.

As to the legality of the search, the Court finds that the troopers' search of the interior paneling of the doors was justified as their testimony supports that the interior paneling is an area that could conceal contraband. *See Salemi-Nicoloso*, 353 F. Supp. 3d at 539. As noted, Trooper Jones merely lifted a corner of the interior paneling located on the right passenger door before finding the guns inside the panel—all *after* he noticed the issue with the windows and *after* Trooper Zachary heard a sliding sound upon moving that same door back and forth. Thus, the Court rejects Gebrezghi's argument that the troopers "dismantled" his vehicle in order to find the guns. Instead, the Court finds that the troopers had independent probable cause to look in that area. *See United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995) (rejecting defendant's argument that law enforcement dismantled or dissected his car where the record revealed troopers "merely unscrewed two screws and removed two vent covers from the interior panels.").

In sum, taking into account the totality of the circumstances surrounding the search, the Court finds that the troopers had independent probable cause to search the vehicle, including the interior paneling of the doors where the firearms were found. *See McSween*, 53 F.3d at 686. Additionally, the Court finds the troopers had probable cause to continue the search of the other door panels upon initially finding the handguns in the right passenger door paneling and receiving information of Gebrezghi's prior conviction. *See id*. The search was valid in its entirety.

15

*Conclusion*

For the reasons set forth above, Gebrezghi's Motion [33] is DENIED.

SO ORDERED this the 29th day of January, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE
